Good morning, Your Honor, Mr. Dory Lewis on behalf of Ms. Foster. May it please the Court? Mr. Glasser. The trial court recognized that Aaron Danzig's testimony was highly relevant to Ms. Foster's withdrawal defense. Those are the words of the trial court. Yet during the cross-examination of Mr. Danzig, the prosecutor inserted his own reputation and personal standing and put it before the jury. He also improperly referenced the convictions of co-conspirators and used it in a manner to use it as affirmative proof of Ms. Foster's guilt and to undermine Mr. Danzig's credibility. He referenced people convicted at trial, people who reached plea agreements with the United States, people who admitted guilt that don't have plea agreements with the United States in cross-examining Mr. Danzig to try to show the jury that he was a liar. Mr. Danzig's testimony was central to Ms. Foster's case because it established that in 2008 in November, when he contacted her on behalf of Karen Kalin Zuri, the CEO of Hollywood Pavilion and Hollywood Pavilion, and asked for her assistance to meet an investigation by the United States, Ms. Foster told him that she would have nothing to do with it and that she hated Karen Kalin Zuri. I think, for my part, I think you've got a stronger argument with regard to what happened during Mr. Danzig's examination. But with regard to the convictions, wasn't the jury going to learn and didn't it learn necessarily that these witnesses who testified had been convicted? I mean, wasn't that going to come out and didn't in fact come out no matter how the prosecutor characterized it? In fact, it did come out, Judge Jordan, and it had come out prior to that, and that was an issue that was raised with the court. However, the manner in which it's used, and I would direct the court's attention to Miranda, one of the cases cited in the briefing in this case. The manner in which it was used, this is evidence that was properly admitted for one purpose. It was put to use for a completely improper purpose, which was to say, Mr. Danzig, his presentation to the government was a lie, that he was trying to obstruct justice, and we know this because you can look back and see all of the people who were convicted at other trials, by plea agreements, and without plea agreements. So it was the use of that and then couple that with the arguments that were made. For example, Keith Humes, convicted of multiple felonies, Judge. Yet in closing argument, the prosecutor doesn't talk about Mr. Humes' other felonies. But doesn't, I thought your client didn't question her involvement in the conspiracy. She just claimed that, yes, she was a member, but she withdrew earlier and before the statute limitations. And so all of this went to the question of arguably contaminating somehow the finding that there was a conspiracy. But everybody pled guilty to this conspiracy, and presumably, and your client doesn't really deny the conspiracy, her participation in the conspiracy. Judge Walker, I think what the court's question implicates is the concession that I've made in this appeal, that there was adequate proof of the conspiracy. However, I will say a trial, a fair view of the record, establishes that there were two components to the defense. One was withdrawal, and the other was to challenge the weight of the government's evidence of the sufficiency. And I think that a fair reading of the record shows that that was a strategic decision made to help swallow the pill. Well, this particular, all of this evidence of prior convictions on the part of these witnesses, the court gave a limiting instruction that it wasn't to be considered as proof of your client's guilt. And I don't think the government ever argued directly that this was proof. I mean, you know, you could say, well, the jury would have reached that conclusion, but if they did, they'd have to ignore the court's instruction. And the government didn't affirmatively try and prove it, prove the guilt of your client through these witnesses having pled guilty. Well, I think, Judge Walker, this turns us back to Miranda, which is a case where it was reviewed on plain error review, and there was a limiting instruction. There was actually instruction given by the court in that case where they were told, don't pay attention to what happened in these other trials. And even on the highest standard, a plain error review, the court reversed the convictions in that case and said it was improper to use what would have come improperly, these convictions of co-conspirators, that was used in a completely improper manner. But when you couple that with what was really going on here, and the word that is used in the record is vendetta, prior to the prosecutor's examination where he says, the allegations I made about you in another district courtroom to the witness. When you couple what was going on, which was this personal contest between the prosecutor and the witness, Ms. Foster's key witness, the only witness that was called on any substantive basis in this case to establish the withdrawal, you get a broader picture of what was going on. And what was going on here was an effort by the government, a calculated effort by this prosecutor to demolish this witness by putting the prosecutor's credibility on the line. He said, the court, meaning another district court, no evidence in front of this allegations that I made about your obstruction. That was objected to and overruled. Excepting the fact of this all happened, I think, wasn't the dancing questioning in 2008, or did that relate to the 2008 meeting, role of dancing in his investigation? Yes, sir. The meeting, the interview was in 2008, November. However, it tied into the 2005 resignation letter. I understand that. But the question of resignation or withdrawal has already been decided by this court, correct? No, I don't believe in the standard that's under review now. It has been judged. The court determined that the trial court erred in granting a judgment of acquittal. That I was viewing the evidence in a light most favorable to the United States. However, there's no finding in that opinion. There's no instruction in that opinion that says that withdrawal did not get established as a matter of law. And in fact, the error review standard that's talked about in Miranda, which I would turn the court's attention to again, says that the error... Your point is it was a jury question and this adversely affected how the jury decided. In all of the cases that deal with these issues, Your Honor, tell the court to de novo review the entire record to weigh the error to determine whether it was harmless. And what Miranda says is they say the harmless error standard only operates to excuse error, to excuse error, which we have here, where evidence of the defendant's guilt is exceptionally strong. Now in this case, Ms. Foster, and this is a consideration that the court needs to weigh, Ms. Foster had the burden, a preponderance of the evidence, a slight burden to carry in putting forward her withdrawal defense. And this man's testimony was central to it and his credibility was central to it. If the jury had believed what Aaron Danzig had said, they could have found withdrawal on any of the three acts. Because the question that was presented to the jury in closing, and still stands when you review the record, what did she do after November of 2008 to continue in this conspiracy? Nothing. And then in 2009, in March, you have a meeting with an FBI agent where Judge Altanaga, although reversed by this court previously, reviewing that evidence, said that was sufficient. So you have a district judge, even though the court found on the standard that it was reviewing then, coming in and saying, hey, this withdrawal defense was substantial and it merits more acquittal. The court, on viewing it in the light most favorable to the government, disagrees. Here, I don't have that problem. The court's review is de novo and the error was not harmless. What was the evidence of her affirmative disapproval that she conveyed either to the co-conspirators or to law enforcement? Disavowal, rather, of the conspiracy. So there are two acts of disavowal. In September of 2005, she faxed a resignation letter to Hollywood Pavilion, which was found when they executed the warrant on the desk in the office of the CEO. Simply leaving a job doesn't necessarily mean you're out of the conspiracy. Judge Walker, that's correct. But in this district, there's a case, Morton's Market, which has been discussed, and it comes up in another one named Bergman, where a resignation and an arias were a resignation that is communicated when it's an act on behalf of the defendant who's asserting the withdrawal defense, where it's communicated to the co-conspirators in a manner that's reasonably calculated to reach the co-conspirators. In other words, I'm out. You can't count on my services anymore, is withdrawal. And they reversed in arias, where the instruction wasn't given based on that evidence. In Morton's Market, when a man sold his business, by the way, as Ms. Foster did in this case. It was simply that her salary had been lowered, or her salary had been lowered, and she didn't like her boss. And now, Your Honor, you're highlighting the issue here, because with Aaron Danzig's testimony, when he came in and said in 2008, this is what she said to me. She compared the CEO to Freddy Krueger. So if she left because she didn't like her salary under this court's press, that's enough. As long as they didn't fire her. It's an act on her behalf to leave. But in 2008, if the jury believed what she said to Mr. Danzig, it explains that departure. It says, no, I wanted nothing to do with these people because I detest them. I view her as a nightmare. A little different from saying I didn't want anything to do with these people because they're engaged in a conspiracy, and I no longer want to participate in it. Well, she doesn't have to say that. Example, Morton's Market, Your Honor. This court found that, as a modern law, the sale of a business in a price-fixing conspiracy, just the sale of the business that was published in the newspaper, was enough. In Arias, Dr. Sardouhi sent a letter, not to the co-conspirators to say he was out, but to Medicare, saying, hey, I'm no longer taking patients for first option. And that was sufficient. Nowhere in the letter did it say, I don't want to be a part of this conspiracy. But when you have the 2009 statement, where she goes in and she highlights the Medicare fraud that was being committed at Hollywood Pavilion, it further explains the 05 letter and the 0 statement to Mr. Danzig. And the overriding point here, Your Honor, and I'm well past my time and I apologize, is that the defense was strong. And the improper questioning by the prosecutor destroyed Mr. Danzig's credibility because he placed the office of the United States Attorney against this witness's credibility in front of the jury over objection. Before you sit down, I just wanted to complete one thought. You said there were two things demonstrating her disavowal. One was the resignation letter. Is the other one her conversation with Mr. Danzig? Yes, Your Honor. And then the third, I guess under this court's precedent, you would call it a disavowal, and then you look to the second part to see what was it. Was it communicated or was it to law enforcement? And that disavowal was communicated to Special Agent Durango in March of 2009 when she told him about the crimes, including patient brokering, providing services that weren't necessary, recycling patients. I mean, words, frankly, that the government took and placed in its indictment in this case. Thank you. Good morning. Good morning. May it please the Court, William Glasser for the United States. I'd like to begin briefly by contextualizing Mr. Danzig's testimony in this case. Mr. Danzig was primarily called as a witness for the co-defendant at trial, Dr. Kaplowitz, and he was extensively examined on direct examination by Kaplowitz's attorney in an attempt to establish or insinuate to the jury that there wasn't actually anything too serious going on at Hollywood Pavilion, and therefore Dr. Kaplowitz wouldn't have noticed the fraud that was going on. The direct examination by Ms. Foster's attorney was only 11 questions and was simply to establish the one fact, that when called by Mr. Danzig in fall of 2008, she said that she did not want to assist in the internal investigation of Hollywood Pavilion because she, quote, hated Karen Kaelin Zuri, the one who ran Hollywood Pavilion. So Mr. Danzig was called for a very supports her withdrawal defense, that she hated the person who owned and operated Hollywood Pavilion, but it's only incremental, and therefore the cross-examination and the undermining of the credibility of Mr. Danzig did very little to undermine her withdrawal defense. And then if I may turn to the strength of her withdrawal defense, to some extent where... Before we do that, that gets to whether or not there was any error and whether or not any error was harmless or not, but I'll grant you that given Mr. Danzig's testimony on direct examination, the government was entitled, as Judge Altanaga recognized, to try to show that his investigation had been very shoddy and that he couldn't be trusted as a witness with regards to whether anything nefarious was on at Hollywood Pavilion. I'll grant you that. Yes, Your Honor. But I've yet to see any proper justification for putting before the jury the prosecutor's direct personal accusation against Mr. Danzig before a district judge, evidence of which was not in front of the jury, and then suggesting to the jury that because the judge wanted to sort of follow up on it and look a little closer at it, that that indicated the prosecutor was right and that Mr. Danzig, if he didn't commit obstruction, was very damn close to committing obstruction. That's wrong, right? Your Honor, I would agree with you that this really is something that was irrelevant and probably shouldn't have been in front of the jury, this personal contest between the prosecutor and Mr. Danzig. However, we're here under the rubric of prosecutorial misconduct. Yeah, well, that's just wrong. You can't put before the jury the veracity of that prosecutor in a different hearing where a judge has made comments and then put the imprimatur of the judge's comments on the prosecutor's behavior to show that the prosecutor who's doing the cross is more believable than the witness who's testifying. That just can't be done, right? Your Honor, I completely agree with your concern, but again, if I may explain, there were no objections earlier in the cross examination to the questions about some of these obstruction allegations. Where it really came to a head was right at the end of the recross, and I could direct the court's attention to what exactly was said. There were two questions specifically about the judge in the prior case, whether that judge wanted investigation. The first question was, the court in that case did not dispute the allegations that I made about your obstruction, did they, or did it at that time? The answer came out before the objection. Mr. Danzig said, I was not in court to respond. At that point, there was an objection, and the only question after that the court sustained the objection to. The second question was, Mr. Danzig, the fact that the court entertained that discussion and had follow-up shows that my allegations of your obstruction, which you object to, were not demonstrably false, correct? And the court sustained that objection. So at that point, there was no evidence before the jury other than that one answer. I know, but you know, every once in a while, the asking of the question can be bad enough. Your Honor, I recognize that. I mean, there was an instruction in this case. The district court specifically told the jury that questions or anything that was said by counsel was not evidence. And again, the objection here, the objection is, the claim on appeal is one of prosecutorial misconduct. And certainly, I would concede here that this probably isn't something that ought to have been brought to the jury's attention. However, whether it rises to the level of misconduct, particularly misconduct that affected the fairness of the trial, is a completely different question. We're talking, essentially, I think this has come down to those two final questions at the end, one of which was never answered. And to say that that, specifically under the plain error standard, to say that that affected the fairness of the trial to the extent... I think there's a third question, isn't there? The question, and the court wanted further investigation into your obstruction, your obstruction, Mr. Danzig, after my comments about it to the court, correct? And then, you know, the one that you read, the court, the fact that the court entertained that discussion and had follow-up shows that my allegations of your obstruction, Mr. Danzig, which you object to, were not demonstrably false. And then, again, the court in that case did not dispute the allegations that I made about your obstruction. And there were a couple of objections to that series of questions. Your Honor, yes, there were objections. But where this really came to the head, with respect to, as I understood Judge Jordan's question, the question of the sort of asserting what the district court did in the prior case, that was only at the end of the recross examination. I agree with you, though. There were prior questions regarding obstruction of justice. And it was appropriate for the prosecutor to attempt to undermine Mr. Danzig's credibility. Now, whether or not it should... But it's not just... And again, this doesn't go to the question of whether or not the error was harmful. But it's not just equating or putting into evidence somehow the district court's view of the whole thing. It's putting the trustworthiness of the prosecutor against that of the witness. I'm not saying he couldn't have asked him questions which might have led a jury to believe that he was guilty or was involved in some sort of obstruction. But you can ask those questions without inserting yourself, and I don't mean you, inserting yourself as the prosecutor in a contest for veracity with the jury. Absolutely, Your Honor. I think you can. However, in this instance, Mr. Danzig was the one who specifically said that the prosecutor's accusations were demonstrably false. And actually, if you look at the transcript, it's kind of funny that... Before the prosecutor asked these questions? Your Honor, when the prosecutor had asked about obstruction of justice, but Mr. Danzig, on redirect examination, had talked about demonstrably false accusations that had been made in the prior case. And the prosecutor in this case, whose name was Mr. Warren, was actually attempting to clarify that those accusations had been made by another prosecutor, Mr. Zink. And when he did so, that's when Mr. Danzig said, no, you actually made demonstrably false accusations against me. But he's cloaking himself in the authority of the allegations that I made about your obstruction. The second one is the court wanted further investigation into your obstruction after my comments. And this is another court that's not there. And then the third question, the court entertained that discussion and had follow-up showing that my allegations of your obstruction were not demonstrably false. So he's speaking for the court, which I think you agree with me is improper. Your Honor, it wouldn't be improper for him specifically to speak for the court. But are you disputing that he was speaking for the court? Your Honor, he was simply asking a question with... And I mean, certainly questions, as Judge Jordan pointed out, sometimes questions do contain enough facts that they can be disputed. Yes, Your Honor. And that's a question that Mr. Danzig could have answered. Would you mind focusing... I think we're almost all in agreement here that this was a problem. You've basically conceded as much. Would you focus on why this was harmless error or wasn't prejudicial to the outcome? Yes, Your Honor. And in fact, as we explained in the brief, the prosecutorial misconduct allegations, I think, are reviewed for plain error. Because although there were objections to the question, there was never at any point a claim of prosecutorial misconduct, which is a different rather than an evidentiary objection. It's something that requires a motion for mistrial. But it was harmless, again, as I began my remarks, because Mr. Danzig, first of all, was not a key witness for Ms. Foster. On direct examination, she merely asked him those questions to establish that she had communicated her distaste for the owner of Hollywood Pavilion. So even if the jury had completely disregarded all of Mr. Danzig's testimony, the evidence would have been sufficient for the jury to... And in fact, overwhelmingly showed that Ms. Foster did not withdraw from the conspiracy. You're saying that the evidence relating to the withdrawal defense really wouldn't have been affected by this. Correct. Your Honor, it was weak evidence. And I understand that the district court concluded based on the prior case that this court reversed, concluded based on her disclosures to the FBI that she withdrew. That really hasn't been the focus of her error argument on appeal. Primarily, she's been focusing more on the letter that was sent to Hollywood Pavilion, that faxed letter. And that letter was not an adequate withdrawal, not only because it simply said that she was moving on, but she actually stated that her interactions with Hollywood Pavilion had been pleasant. And she said that she was going to continue to claim reimbursement for her referrals that she had sent up to that point to Hollywood Pavilion. In other words, she's saying, I'm going to continue receiving the illegal kickbacks that you have been sending me. So when you tell a company that you're resigning, that you plan to continue to violate the law in order to get the money that you believe you're entitled to, that is not an effective withdrawal. So Mr. Danzig, again, Mr. Danzig... Why did, although a panel of this court concluded that the district court got it wrong in taking the issue away from the jury, why did Judge Altanaga think that the withdrawal defense was so strong? Your Honor, Judge... Even if she got the legal issue wrong, was she completely wrong about the fact that it was an adequate withdrawal defense? Your Honor, Judge Altanaga did not reach the faxed letter, but only focused, only granted the Rule 29 based on the disclosures to the FBI agents. And yes, with respect, I think Judge Altanaga got it wrong. I mean, this court agreed under the standard of review that applied. But even I think if this court were to address it under the appropriate prejudice analysis here, I think the evidence was still more than enough to show that Mr. Danzig's even if it were completely undermined, would not affect the case. And I can explain why. The Judge Altanaga relied upon the statements that Ms. Foster made to the FBI agents in spring of 2009. And she disclosed that there were some fishy things going on at Hollywood Pavilion. She said that they didn't provide all the services that were listed on their treatment schedule. She said that they didn't wait 30 days between patient assessments, that they recycled patients. But what she never told the FBI was that Hollywood Pavilion was submitting false claims to Medicare, and specifically that they were paying kickbacks, including to her. Ms. Foster was the primary patient recruiter for Hollywood Pavilion. She accounted for one-fifth of their inpatient billings, about seven times as many as the next highest patient recruiter. And she actually affirmatively misled the FBI agents by saying that Hollywood Pavilion was a detox facility, when in fact it was an inpatient psychiatric hospital. She said that she had two doctoral degrees and a master's degree, which evidence established at trial that she did not. And most importantly, perhaps, she gave the FBI agents a copy of her quote-unquote marketing contract that was an attempt to cover up the fact that she was being paid for the illegal kickbacks at Hollywood Pavilion. So with respect to the district court... But you're not saying that wasn't a real document. That was a real established was to cover up the fact that illegal kickbacks were being paid. Hollywood Pavilion initially didn't have that, and then created it to cover up that fact. You know, I just wanted to focus you on the cases that your brother has mentioned, the Morton's Market. I mean, the law is a little bit different in the 11th Circuit about what it takes to disavow. And certainly in Morton's Market, the withdrawal from... It was a milk producer, dairy farmer. Yes, Your Honor. Well, first of all, and with respect to your dissent in the Bergman case, the majority of the Bergman court, I did, I think, limit Morton's Market to specific situations where a business was sold. However, that aside, I think this is a different situation than Morton's Market. First of all... She didn't have a business to sell. Correct. Well, she had a business, the Angels Outreach, but that was totally unrelated to Hollywood Pavilion. And so I believe that Ms. Foster in her brief has pointed out that she sold that business, but it's a different situation. But as I pointed out, additionally, that faxed letter, it actually indicated her intent to continue receiving illegal kickbacks, which I think is very different from the Morton's Market case. And finally... She sent that letter in August and she received payments through September, through the following month. Oh, okay. So I think that that's... Would that have put her within the five-year statute of limitations window or not? Your Honor, that... The receipt of payments. I'm trying to remember here the exact dates because I believe that the receipt of that would not have, but the question... So no, that would not have put her within the five-year statute of limitations, but the government's because there was no withdrawal, then she was continuing in the conspiracy, even past the period of the FBI interview in spring of 2009. The interview in terms of temporal scope was how long after her letter? That was approximately five months, I believe, in March of 2009. So in the following spring. Correct. And the government recognized in the prior briefing, in the prior case, that if she withdrew, even in spring of 2009, that she still would have been out of the conspiracy. However, our position is that she never withdrew. Thank you. I need to correct a couple issues on the record. Number one, Ms. Foster did not continue to receive payments after she resigned in September of 2005. Government Exhibit 45 are the checks, which by the way, were made out to Angel's Outreach, her business, Judge Martin. The last checks were issued on August 31st of 2005, and they were referenced in the indictment as the actions that were her last overt acts on the 371 charge. She never received payment, and I would invite the court to look through Special Agent Mitchell's testimony on that, and Special Agent Koth's testimony on that, and Alan Goomer's after September of 2005, she was gone. In addition, if you turn to Docket Entry 344, at pages 157 to 60, this is Special Agent Koth's testimony, he acknowledges that shortly after she resigned, Ms. Foster sold Angel's Outreach. She sold her business that was receiving payments from Hollywood Pavilion. She literally had nothing to do with Hollywood Pavilion after September of 2005, and that's why Mr. Danzig's testimony was so important. Just to ask you the same question about temporal scope that I asked Mr. Glazer, how long after she sends the letter does she meet with the FBI agents? Is he August 2005? I have a fact sheet, Judge, on Government Exhibit 118. It was sent September 13th of 2005. Okay, and then when does she meet with the FBI agents in the meeting that Judge Altanaga thought was so important to her withdrawal defense? March of 2009, which is five months after Danzig's attempted interview of her in November of 2008, but after 2005. About three and a half years later. That's correct, and Mr. Danzig's testimony, the government points out 11 questions. First of all, he was subpoenaed by Ms. Foster. Judge Altanaga recognized the importance of his testimony, and not to the co-defendant, by the way. She also said that in the statement. She was to advance her withdrawal defense. He asked her for documents. He asked her for help. So he explained to her that he was trying to assist Hollywood Pavilion in meeting an investigation by the United States into Medicare fraud, and she refused to help him. He testified that this was unhelpful to him. This was communicated to the agent, to the lawyer, for the business itself, and for the individual who was at the apex of this conspiracy, Kalen Zuri. And she told her, I want nothing to do with her. It was Freddy Krueger, Nightmare on Elm Street. Now, you have to put that in the context of five months later going to the FBI. The FBI agent, Special Agent Durango testified, he did ask her for documentation. She gave it to him. And in a situation like this, you're basically saying the evidence wasn't sufficient, aren't you? I mean, you're saying that taking all the evidence in the light most favorable to the government, there wasn't enough here to show withdrawal. And isn't that the precise issue that was before the earlier panel on this case? How does it differ from their decision that there was sufficient evidence for the case to go to the jury, and from our view now, looking at the case, in the light most favorable to the government? Well, Judge Walker, because that's the wrong standard. The court is not to take the evidence in a light most favorable to the government. On reviewing? That's absolutely correct. In this case, Judge, you are not reviewing in a light most favorable. I thought we were looking, you now seem to be arguing the sufficiency of the evidence, aren't you? No, Your Honor. I thought you, I mean, you started off by arguing that it's a jury question, and the jury obviously was affected by prosecutors' improper conducts, and also the admission of these other pleas. But lately, at least now, the latter discussion has been the sufficiency of the evidence taken in the light most favorable to the government. That's the way one reviews the sufficiency of the evidence. Let me correct something I said, Judge. The sufficiency of the evidence, the weight of the evidence to the withdrawal defense is important, and the court must review it. But the standard is de novo. The court, unlike the prior case, is not to view the evidence in a light most favorable to the government. That is absolutely not the standard to review in this case. The court is to conduct a de novo review under a harmless error analysis and decide whether the government's error is excused because the evidence of guilt is exceptionally strong, not in a light most favorable to the government. So here you have all of these acts that she did, beginning in 2005, followed in 2008, done in 2009, where she absolutely distanced herself from the conspiracy, communicated it to people involved in the conspiracy. And there's not one piece of evidence that the government has pointed to other than incorrectly suggesting there were payments after she left. Isn't the question whether the evidence was sufficient for a reasonable jury to reach the conclusion that it did beyond a reasonable doubt? That's not the issue on appeal, Judge. I know that, but that seems to be what you're arguing now. Judge, what I'm arguing is that the evidence of her withdrawal, the sufficiency of that withdrawal defense, which she had the burden of in this case, was strong, that there was no proof. Your argument is as follows, I think. You tell me if I got it wrong. You do not contest the sufficiency of the government's evidence to convict your client, right? Correct. You acknowledge, as you have to because of the prior panel decision, that the question of withdrawal was a question for the jury. Correct. Correct. But your argument on the evidence is that this is not a case where the government's evidence of guilt was overwhelming or substantial. And on the other side of the scale, your evidence on withdrawal was strong, if not legally determinative, so that the prosecutor's misconduct tilted the scales and constituted harmful error. Judge, that is 99% correct. The only difference, the only difference, Judge, is that the weight of the government's proof of the conspiracy is irrelevant. What matters on review is the weight of the government's evidence to meet and defeat her withdrawal defense, which was substantial. And that's where they had no evidence other than the improper cross-examination, where the prosecutor put the prestige of his office against that of this witness. Thank you. We're going to nominate you for the diplomatic corps. I accept.